# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| DONNAMARIE KAMINSKY, | ) | CASE NO. 5:19-cv-20 |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | **MEMORANDUM OPINION** |
| | ) | |
| ROBERT WILKIE, Secretary, U.S. | ) | |
| Department of Veterans Affairs, | ) | |
| | ) | |
| DEFENDANT. | ) | |

Before the Court is the motion for summary judgment (Doc. No. 52 ["MSJ"]) filed by defendant Robert Wilkie, Secretary, U.S. Department of Veterans Affairs ("VA or "defendant"). Plaintiff DonnaMarie Kaminsky ("Kaminsky" or "plaintiff") filed a response in opposition (Doc. No. 56 ["Opp'n"]), and the VA filed a reply (Doc. No. 58 ["Reply"]). For the reasons discussed herein, the VA's motion for summary judgment is granted.

## I.    PROCEDURAL BACKGROUND

Kaminsky commenced this action on January 3, 2019. She amended the complaint twice, first as a matter of right and then with leave of Court. The second amended complaint (Doc. No. 9 ["Compl."]) sets forth seven counts: discrimination, failure to accommodate, and hostile work environment under the Rehabilitation Act of 1973 ("RA") (Counts I–III); discrimination and hostile work environment under the Age Discrimination in Employment Act ("ADEA") (Counts IV–V); and reprisal under both the RA (Count VI) and the ADEA (Count VII).[1] Following

---

[1] Kaminsky alleges that, on several occasions, she was denied leave under the Family and Medical Leave Act ("FMLA"), thereby being forced to use annual leave. (Compl. ¶¶ 79, 93, 113, 123, 131.) However, she raises these allegations only as evidence of discrimination. There is no separate claim under the FMLA and, since Kaminsky has already amended her complaint twice, she appears to have had no intention of making any such claim.

discovery, the VA filed the instant motion for summary judgment, which is fully briefed and ripe for determination.

## II.    SUMMARY JUDGMENT STANDARD

When a party files a motion for summary judgment, it must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . .; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the nonmoving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co*., 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943–44 (6th Cir. 1990), *impliedly overruled on other grounds by Salve Regina Coll. v. Russell*, 499 U.S. 225, 111 S. Ct. 1217, 113 L. Ed. 2d 190 (1991). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [nonmoving party] is entitled to a verdict[.]" *Id*. at 252.

"Once the moving party has presented evidence sufficient to support a motion for summary judgment, the nonmoving party is not entitled to trial merely on the basis of allegations; significant

probative evidence must be presented to support the complaint." *Goins v. Clorox Co*., 926 F.2d 559, 561 (6th Cir. 1991). The party opposing the motion for summary judgment may not rely solely on the pleadings but must present evidence supporting the claims asserted by the party. *Banks v. Wolfe Cty. Bd. of Educ*., 330 F.3d 888, 892 (6th Cir. 2003); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (finding that summary judgment is appropriate whenever the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial). Moreover, conclusory allegations, speculation, and unsubstantiated assertions are not evidence, and are not sufficient to defeat a well-supported motion for summary judgment. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). In other words, to defeat summary judgment, the party opposing the motion must present affirmative evidence to support his or her position; a mere "scintilla of evidence" is insufficient. *Bell v. Ohio State Univ*., 351 F.3d 240, 247 (6th Cir. 2003). Rule 56 further provides that "[t]he court need consider only" the materials cited in the parties' briefs. Fed. R. Civ. P. 56(c)(3); s*ee also Street v. J.C. Bradford & Co*., 886 F.2d 1472, 1479–80 (6th Cir. 1989) ("The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact." (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988))).

Under this standard, the mere existence of some factual dispute will not frustrate an otherwise proper summary judgment motion. *Dunigan v. Noble*, 390 F.3d 486, 491 (6th Cir. 2004) (quotation marks omitted) (citing *Anderson*, 477 U.S. at 247–48). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

### III.     DISCUSSION

#### A.     General Factual Background

Although Kaminsky raises several claims in her complaint, they are all supported by the same general factual background set forth below. More claim-specific facts will be incorporated, as appropriate, within the separate discussion of each claim.

Kaminsky began her employment at the VA on June 1, 2001. She served "in chaplain pastoral care, [as an] education/training specialist doing grief and bereavement, in addition to pastoral education of the chaplains." (Doc. No. 53-1, Deposition of DonnaMarie Kaminsky ("Kaminsky Dep.") at 806 (59).[2]) Kaminsky holds "a masters degree in Franciscan Theology and Spirituality from St. Bonaventure University in New York." (*Id.* at 800 (35).) In addition, she is a certified thanatologist ("CT"), a professional designation from the Association for Death Education and Counseling ("ADEC"); she qualifies at the highest level of "FT" or "Fellow of Thanatology." (*Id.* at 801 (41).)[3] Kaminsky also holds a grief recovery specialist certificate from the Grief Recovery Method and grief counselor certification through the American Academy of Grief Counseling. (*Id.* at 803–04 (49–51).) In addition, she is trained in clinical pastoral education ("CPE"). (*Id.* at 806 (59).) At the time of the relevant events alleged, Kaminsky was 71 years old. (*Id.* at 836 (178).)

---

[2] All page number references are to the page identification number generated by the Court's electronic docketing system. Where, as with Kaminsky's deposition, a transcript contains four pages per sheet, the Court will also cite the exact deposition page number in parentheses.

[3] It takes approximately one year to study and obtain the CT qualification from the ADEC; a written national examination is required. (Kaminsky Dep. at 802 (43).) After about three years as a CT, one can study for another year and take another national examination for the FT qualification. (*Id.*) Kaminsky holds both qualifications, which she pursued on her own due to her interest in grief and bereavement.

4

In 2004, the VA was developing a new program called Contract Home Hospice. William Montague, the Medical Center Director at the time, asked Joseph Aquilina ("Aquilina"), then Chief of Social Work Service, to create a position for Kaminsky within the social work care line "since she had a particular interest in grief and loss and bereavement." (Doc. No. 53-2, Deposition of Joseph T. Aquilina ("Aquilina Dep.") at 1027–28.) Aquilina took on the task of writing the new job description and getting it classified. (*Id.* at 1029–31.) The formal title of the position was "Training Specialist," but the organizational title was "Grief/Bereavement Counselor & Educator." (*Id.* at 1030.) Eric Johnston ("Johnston"), a "classifier" for the VA, filed a declaration attached to the VA's reply brief, wherein he attests that "[a]t the VA, some positions have both an official title and an organizational title[,]" and that "[o]rganizational titles are more descriptive than official titles and are intended to reflect what the employee is actually doing." (Doc. No. 58-2, Declaration of Eric Johnston ("Johnston Decl.") ¶¶ 1–2.)[4] Johnston further attests that an "employee's position description may not specify the licenses and/or certifications that the employee may be required to hold due to that employee's work." (*Id.* ¶ 3.) The position of Training Specialist paid according to the GS pay plan at Grade 12 ("GS-12"). (Kaminsky Dep. at 819 (110); 1009–16 [Def. Ex. O].[5])

Kaminsky took on this new position in 2004 and, at the time, the VA knew her background and training, including the fact that she was not a social worker. (*Id.* at 797 (25); Aquilina Dep. at

---

[4] Johnston's declaration is one of five that were attached to the reply brief. Kaminsky has moved to strike all of the affidavits, arguing that they present unfair surprise and should have been included with the original motion. (*See* Doc. No. 59, Motion to Strike, *passim.*) In opposition, the VA asserts that four of these affidavits are responding to specific matters raised by plaintiff in her opposition to summary judgment and are, therefore, properly filed and considered. (Doc. No. 60, Opposition to Motion to Strike at 3518 (citing *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 476–77 (6th Cir. 2002).) At least with respect to Johnston's declaration, the VA is correct. The motion to strike, to the extent it addresses Johnston's declaration, is denied because the declaration is not raising new issues, but is replying to arguments relating to her job description raised by Kaminsky in her opposition brief.

[5] There are several copies of Kaminsky's job description in the record. The Court will consistently refer to the copy attached as Defendant's Exhibit O to Kaminsky's deposition.

5

1036.) In this position, Kaminsky's direct supervisor was the Assistant Chief of Social Work Service—initially Dale Goldstein ("Goldstein"), then Felix (Chris) Esmurdoc ("Esmurdoc"), and, eventually, Debra King ("King"). (Kaminsky Dep. at 797 (25), 807 (65), 808 (66); Doc. No. 55-4, Deposition of Felix Christopher Esmurdoc ("Esmurdoc Dep.") at 2966; Doc. No. 53-3, Administrative Deposition of Debra King ("King Adm. Dep.")[6] at 1495.) Providing care to veterans in their homes was the bulk of Kaminsky's work. (Esmurdoc Dep. at 2985–86.) Kaminsky considered herself a "grief bereavement specialist" and her business card reflected that fact. (Kaminsky Dep. at 797 (23); King Adm. Dep. at 1616 [Pl. Ex. 13].)

In 2016, the VA promoted Debra King to Assistant Chief of Social Work Service; in that capacity, she was coordinator of the home and community-based care program, and Kaminsky's supervisor. (King Adm. Dep. at 1279.)[7] King's first meeting with Kaminsky was on May 19, 2016. (King Dep. at 1723; Kaminsky Dep. at 810 (75–76).) According to Kaminsky, the meeting did not go well; in fact, Kaminsky was "dumbfounded at the belligerence with which [King] talked with me at a first meeting when she had never met me before." (Kaminsky Dep. at 810 (76).) Kaminsky believes: "[I]t was clear, the message that [King] sent to me from day one that she met me was I'm getting rid of you. One way or another, you're out of here." (*Id*. at 811 (80).) King's view of that meeting is different. She recalls that Kaminsky "appeared to get agitated and upset, based on me discussing some programmatic changes[,] . . . her tone raised and she abruptly got up and ended

---

[6] Some witnesses testified during the administrative proceedings at the VA and also had their depositions taken separately for this lawsuit. Where both transcripts are in the record, the Court will differentiate them by adding the "Adm." designation to the former.

[7] King, in turn, reported to Aquilina. (Aquilina Dep. at 1026; King Adm. Dep. at 1296.)

6

the meeting."[8] (King Adm. Dep. at 1316.)[9] Immediately after this meeting with King, Kaminsky went to both Aquilina and Esmurdoc to inquire whether they were planning to eliminate her position; she claims they were both "evasive." (Kaminsky Dep. at 851–52 (241–42).)[10]

Kaminsky's official duty station was VA Wade Park Medical Center in Cleveland, although she spent the majority of her time seeing veterans in the community and did not regularly come to Wade Park. (*Id.* at 815 (96); 816 (98).) At Wade Park, her office was in borrowed space located within the Blind Rehabilitation Service (not Social Work Service). (King Adm. Dep. at 1341–42.)

There is no dispute that Kaminsky has known impairments for which she requested accommodation.[11] She had knee surgeries in April 2006 and October 2007, and spinal surgery in

---

[8] King's intent to make programmatic changes became evident as early as November 2016 when she gathered a work group of individuals to "re-structur[e] . . . the Community Hospice Program." (King Dep. at 2079 [Pl. Ex. 198].) This group ostensibly included Kaminsky, but Kaminsky claims she was brought in after others in the group had already developed a "template" for home hospice and that she was "voted down by three" when she tried to offer input. (Kaminsky Dep. at 840–41 (197–98); 845 (215).) Kaminsky views this restructuring as just another action by King aimed at "remov[ing] [Kaminsky] from the position." (*Id.* at 845 (216).)

[9] King discussed several matters with Kaminsky during this meeting, including what is referred to as her "tour of duty." Kaminsky worked from 7:00 AM–3:30 PM, a practice that had begun when she was caring for her elderly parents (who are now deceased). (King Adm. Dep. at 1311.) King expressed concern that Kaminsky was working at times when she "did not hav[e] any staff leadership support while she was in the community[,]" (*Id.* at 1312), since those in leadership started work at 8:00 AM. Kaminsky also had a practice of meeting with veterans outside her regular tour of duty and then claiming compensatory time ("comp time") for the scheduled after-hours work. King questioned why Kaminsky did not simply "flex" her hours to accommodate appointments that were scheduled to offer usual input and directed her to begin to do so. (*Id.* at 1312, 1332–33.) King eventually also directed Kaminsky to modify her hours from 7:00 AM–3:30 PM to 7:30 AM–4:00 PM. (*Id.* at 1356.) Kaminsky believes these "tour of duty" changes were "retaliatory and punitive." (Kaminsky Dep. at 835 (177).)

[10] Based on these developments, in August of 2016, Kaminsky filed a charge of age and disability discrimination and, in September of 2017, she added a charge of retaliation on the basis of age and disability. (*See* King Adm. Dep. at 1606–10 [Pl. Ex. 10]; 1611–13 [Pl. Ex. 11].) There appears to be no dispute that Kaminsky has exhausted her administrative remedies.

[11] "[A]ny impairment that only moderately or intermittently prevents an individual from performing major life activities is not a substantial limitation under the [Rehabilitation] Act." *DiCarlo v. Potter*, 358 F.3d 408, 419 (6th Cir. 2004) (quoting *Mahon v. Crowell*, 295 F.3d 585, 590–91 (6th Cir. 2002)). The VA does not argue that Kaminsky is not disabled under the RA; therefore, the Court need not be concerned with whether her impairment is only moderate or intermittent.

7

December 2012. She has "a spinal injury that manifests in different ways[]" (e.g., pain and drop foot). (Kaminsky Dep. at 793 (8–9).) Kaminsky utilizes a cane and/or a walker. (*Id*.)[12]

Kaminsky first requested a reasonable accommodation on October 2, 2015.[13] (Kafer Adm. Dep. at 2505.) Because of the nature of her work, Kaminsky was assigned a GSA vehicle.[14] (Kaminsky Dep. at 816 (99).) When she reported pain from driving prolonged periods of time in her assigned vehicle, the VA obtained a different vehicle for her, which she reported was helpful. (Kafer Adm. Dep. at 2513.)

Kaminsky's second accommodation request was on March 23, 2016, when she asked for a sit-to-stand desk. (*Id*. at 2518.) On April 20, 2016, that request was approved and referred to the ergonomics team for assessment and installation. At the time, Kaminsky was still occupying the office in the Blind Rehabilitation Service. (*Id*. at 2521.)

While the desk request was initially being processed, King was promoted and subsequently decided she wanted to have her entire Social Work staff together to promote more of a team concept. She advised the supervisor of the Blind Rehabilitation Service that Kaminsky would be

---

[12] Due to chronic pain and her need for treatment, Kaminsky was also approved at various times for intermittent leave under the FMLA and for advanced sick leave ("ASL"). (Kaminsky Dep. at 823 (129).) This left her with a negative sick leave balance. Eventually, when she requested more leave at a time when she already had a negative balance of 166.5 hours, her request was denied because HR "was not confident [she] [would] be able to readily reduce the advanced leave balance during the tenure of her employment based on the existing pattern dating back to March 2012, when she was first approved for ASL." (Aquilina Dep. at 1225–29 [Pl. Ex. 162].) Kaminsky interpreted this denial as a suggestion that she would be (or should be) retiring soon. (Kaminsky Dep. at 850 (235–36).)

[13] The VA has an extensive process for requesting and approving reasonable accommodations and a clear division of responsibilities in that process. (Doc. No. 52-8, Deposition of Bruce Kafer ["Kafer Dep."] at 2104.) Bruce Kafer ("Kafer") is the Local Reasonable Accommodation Coordinator and is responsible for processing accommodation requests. (Doc. No. 53-6, Administrative Deposition of Bruce Kafer ["Kafer Adm. Dep."] at 2487.)

[14] Overnight parking for Kaminsky's GSA vehicle also became a source of contention. Kaminsky lives in Akron and, for her convenience, was originally assigned an overnight spot at the Akron Community Resource & Referral Center ("CRRC"). When Community Support Services moved into CRRC, the parking spaces were needed for its staff. Therefore, Kaminsky's overnight parking spot was changed to Parma, which was then her official duty station. Kaminsky believes King made this change "to make [her] life difficult." (Kaminsky Dep. at 855 (256).)

vacating that office. (King Adm. Dep. at 1339–41.) King chose to relocate Kaminsky to a cubicle

on the fifth floor of the EUL building, where all but one of King's other direct reports were located.

(King Dep. at 1747–48 & 1750.) King and Aquilina informed Kaminsky of her office move on

June 10, 2016 and the move occurred on July 8, 2016. (Kaminsky Dep. at 813 (89); King Dep. at

1761.) The fact of this move, and the way it was undertaken, is a source of contention. Kaminsky

believes that King removed her from an office and installed her in a "half-sized cubicle" as a

discriminatory and retaliatory/punitive act and to purposely create a hostile work environment

aimed at driving Kaminsky out, as evidenced, at least in part, by the timing of the move and King's

alleged refusal to provide the necessary assistance to Kaminsky (in light of her disability) to

accomplish the move.[15]

       Kaminsky's request for a sit-to-stand desk was complicated by the office move since, in

Kaminsky's view, the "half-cubicle" she was assigned was so small that she could not comfortably

move around in it, much less fit the sit-to-stand desk. (Kaminsky Dep. at 822 (123).)[16] Kaminsky

also complained that it was impossible to meet with veterans in the "half-cubicle" both because of

its size and because it was located in a non-governmental area where veterans were not permitted.

(Kaminsky Dep. at 817 (103).)[17] As a result, by the time the desk was ready for installation in

---

[15] Kaminsky asserts she was told she had to be out of her office by July 5, 2016 even though, at the time, it was known that she had an approved, scheduled leave and would not be returning until July 5th. (Doc. No. 53-1, Plaintiff's Responses to Defendant's First Set of Interrogatories (Def. Ex. I) at 980.) She also claims that King refused to order a "move matrix"—which was apparently some sort of formal order issued to appropriate departments within the VA to carry out moves. It is not entirely clear that a "move matrix" was used for simple office moves like Kaminsky's, as opposed to large-scale moves. (Aquilina Dep. at 1072.) Kaminsky does concede that King eventually sent a receptionist, Michael Jennings, to help her move her personal belongings. (Kaminsky Dep. at 846 (219).)

[16] There is also indication in the record that, during these moves, Kaminsky had trouble getting a working computer and/or monitor and telephone. She attributes this to King's failure to timely follow up on her requests, which she further attributes to personal animus on King's part. (Kaminsky Dep. at 858 (268–69).)

[17] This is one reason why Kaminsky is "very angry" about the office issue, believing that King was intending to send "a clear message [that] we're not providing a place for you to continue to see staff and/or veterans with grief and bereavement issues." (Kaminsky Dep. at 817 (102–03).)

November 2016, Kaminsky had been relocated once again—this time to a VA facility in Parma, which remained her official duty station through July 2017. (King Dep. at 1783.)

On November 30–December 1, 2016, the Geriatrics and Gerontology Advisory Committee ("GGAC") conducted a periodic site visit. (*See* Doc. No. 53-2, Ex. 158 at 1205–15.) In preparation for this visit, certain VA employees, including King, were asked to complete a questionnaire. Therein, King identified "post-grief counseling to caregivers" as something she was proud of at the Cleveland VA. (King Adm. Dep. at 1490–91.) She claims she was informed by GGAC during the site visit that "Cleveland did not have the right to offer that service to non-veterans." (*Id.*) King subsequently reached out to Scott Shreve ("Shreve"), the VA's National Director for Hospice and Palliative Care (King Dep. at 1828), who advised her that "VA has limited legislative authority to provide 'bereavement counseling' . . . for non-Veteran family members." (MSJ Ex. J [Doc. No. 52-11].) Shreve also explained that he had previously unsuccessfully submitted four legislative proposals seeking funding for this type of bereavement counseling. (*Id.*)

King apparently went to Aquilina after the GGAC site visit and informed him that the VA was not authorized to service non-veterans in the manner Kaminsky was doing. Aquilina recalls that King also told him the GGAC team "raised questions and concerns about the lack of licensure or certification to perform the duties that [Kaminsky] was performing in her role." (Aquilina Dep. at 1038.)[18] He claims King "was advised there was an OIG ruling on the use of the term Grief

---

[18] If there was any written report following the GGAC site visit, no one has pointed to it. Both King and Aquilina testified that they never saw a report from the visit. (King Dep. at 1861–62; Aquilina Dep. at 1038.)

10

Counselor in the hospice program." (*Id*. at 1156.) Aquilina believes the OIG ruling related generally to use of the title "grief counselor," not particularly to Kaminsky. (*Id*. at 1157.)[19]

Aquilina and King consulted the Human Resources Department ("HR") and, according to Aquilina, HR told them that they "cannot just ignore" Kaminsky's lack of appropriate counseling credentials. (*Id*. at 1061.)[20] Aquilina and King decided to overhaul Kaminsky's job description, with the assistance of classification specialist Johnston (King Adm. Dep. at 1482–84), by writing a job description for a Grief and Bereavement Specialist, which would not involve "direct clinical work with patients."[21] (Aquilina Dep. at 1165.) The draft of this new job description stated that the person holding the position was to "provid[e] grief and bereavement education and support [to] Veterans, caregivers and family members within the community." (*Id*. at 1249 (Pl. Ex. 172).) The aim of the revision was both to comply with the licensing laws and to maintain Kaminsky's pay and benefits as a GS-12. (Franks Dep. at 2638.) As it turned out, when the job description was rewritten to remove all counseling duties, it only classified as GS-9. (*Id*. at 2639; King Dep. at 1807.) Although Franks noted that Kaminsky would have been "eligible for grade and pay retention," (*Id*. at 2736 (Pl. Ex. 87)), in his view, since "the core mission of the job is the grief and bereavement counseling component[,] . . . a rewritten PD [position description], absent these duties, is of little value." (*Id.*)

---

[19] Charles Franks, the VA's Chief of Human Resources Management Service, has no recollection of there being any OIG involvement. He believes the problem with Kaminsky's job qualifications surfaced during the GGAC site visit. (Doc. No. 53-7, Deposition of Charles Franks ("Franks Dep.") at 2601; 2705.)

[20] Aquilina also testified that, to his knowledge, Kaminsky was considered qualified for the position when it was first created. It is unclear when that would have changed or why.

[21] Aquilina, who retired while this process was still underway, recalls first unsuccessfully trying to find an existing position that would both maintain Kaminsky's pay grade and match her credentials. (Aquilina Dep. at 1040.)

At some point, the issue of Kaminsky's lack of licensure was brought to the attention of Susan Fuehrer, the Medical Center Director at the time. (Doc. No. 55-3, Deposition of Susan M. Fuehrer ["Fuehrer Dep."] at 2882; 2890–91.) Fuehrer believes it was raised at one of their daily leadership team meetings, but she does not recall specifically who raised it. (*Id.* at 2891.)[22] Fuehrer eventually made the decision, at Franks' suggestion, to transfer Kaminsky to HR (*id.* at 2897), where she would assume the position of Human Resources Specialist (Employee Education and Development), which retained her GS-12 classification. This was communicated to Kaminsky on July 17, 2017. The new position was to begin on September 3, 2017. (Franks Dep. at 2611–12 & Ex. 93.)

For the interim period between July 17 and September 3, 2017, Kaminsky was offered an opportunity to work on a project with Jason Gatliff, the Integrated Ethics Program Officer, involving the roll-out and implementation of a life-sustaining treatment program. Kaminsky declined this offer and King was directed to assign Kaminsky administrative tasks (*i.e.*, "meaningful duties") until her new position began. (King Dep. at 1803–05.)

Kaminsky's previous grief counseling position was allegedly eliminated. (Doc. No. 52-14, Declaration of Katelyn Amato. ("Amato Decl.") ¶ 3.)[23] Her accommodations for her new office space in HR were "completed in full" on September 1, 2017. (Kafer Dep. Ex. 155 at 2470.) Kaminsky still holds this HR position. (Kaminsky Dep. at 827–28 (144–47).)

---

[22] Fuehrer could not recall whether this lack of credentials surfaced as a result of the GGAC site visit or one of the regular reviews by the Office of Inspector General ("OIG"). (Fuehrer Dep. at 2892.) However, the record reflects that King had concerns about Kaminsky's lack of a license from as early as May 2016, when she was promoted to the position of Assistant Chief of Social Work Service. (*See* King Adm. Dep. at 1482–86; 1682 (Pl. Ex. 51).)

[23] Amato is an Employee/Labor Relations Specialist in the VA's Human Resources Management Service. (Amato Decl. ¶ 1.)

**B.      Discrimination (Disability- and Age-Related) (Counts I and IV)**

Where, as here, a plaintiff has no direct evidence of discrimination, her claims are subject to the burden-shifting paradigm set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).[24] Under this paradigm, a plaintiff must first establish a *prima facie* case of discrimination. If the plaintiff succeeds, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. Once the defendant has met this burden, the plaintiff must then prove, by a preponderance of the evidence, that the proffered reason was merely a pretext for discrimination. *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 547 (6th Cir. 2004). "[A] reason cannot be proved to be 'a pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993) (emphases in original).

The Rehabilitation Act ("RA") constitutes the exclusive remedy for a federal employee alleging disability-based discrimination. *Peltier v. United States*, 388 F.3d 984, 989 (6th Cir. 2004) ("[T]he Rehabilitation Act . . . provides the remedy for federal employees alleging disability discrimination."). To establish a *prima facie* case of disability discrimination under the RA, a plaintiff must show that she: "(1) is disabled, (2) is otherwise qualified to perform the essential functions of the position, with or without reasonable accommodation, and (3) suffered an adverse employment action solely because of [her] disability." *Mitchell v. United States Postal Serv.*, 738 F. App'x 838, 843 (6th Cir. 2018) (citing *Jones v. Potter*, 488 F.3d 397, 403 (6th Cir. 2007)). The

---

[24] With no specificity or record citations, plaintiff asserts in her opposition brief that she has "identified several examples of direct evidence of age and disability discrimination[, but] . . . will analyze her claims under the *McDonnell-Douglas* framework." (Opp'n at 3185, n. 54.)

13

RA has a heightened causation standard, barring discrimination that occurs "'solely by reason of'" one's disability. *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 315 (6th Cir. 2012) (quoting 29 U.S.C. § 794(a)).[25]

To establish a *prima facie* case under the Age Discrimination in Employment Act ("ADEA"), Kaminsky must show that "(1) [s]he was a member of the protected class, *i.e.*, 40 years old or older, (2) [s]he suffered an adverse employment action, (3) [s]he was otherwise qualified for the position, and (4) [s]he was replaced by a substantially younger employee, or additional evidence shows that the employer was motivated by age." *Deleon v. Kalamazoo Cty. Rd. Comm'n*, 739 F.3d 914, 918 (6th Cir. 2014) (citation omitted). The ADEA also requires a showing "that age was the 'but-for' cause of the employer's adverse action." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177, 129 S. Ct. 2343, 174 L. Ed. 2d 119 (2009).

The VA argues that, for either discrimination claim, Kaminsky cannot show she was qualified for the position of "grief counselor" because, by her own admission, she does not possess the license required by Ohio law.[26] Ohio Rev. Code § 4757.02(a)(1) provides that

> [n]o person shall engage in or claim to the public to be engaging in the practice of professional counseling for a fee, salary, or other consideration unless the person is currently licensed under this chapter as a licensed professional clinical counselor or licensed professional counselor.

"Practice of professional counseling" is defined as

> rendering or offering to render . . . a counseling service involving the application of clinical counseling principles, methods, or procedures to assist

---

[25] In the Sixth Circuit, cases under both the RA and the Americans With Disabilities Act ("ADA") apply generally the same standard, except as to causation. *Jones*, 488 F.3d at 403.

[26] Although the VA points to nothing in Kaminsky's position description (under which she worked for almost 15 years before being challenged by King) that requires her to have a counseling or social work license to perform her duties, Eric Johnston, a classifier for the VA, attests that a job description "may not specify the licenses and/or certifications that the employee may be required to hold due to that employee's work." (Johnston Decl. ¶ 3.) Kaminsky has moved to strike Johnston's declaration, attached to the reply brief, but the Court concludes striking is not warranted because the declaration is responding to matters raised in plaintiff's opposition brief. (*See* Opp'n at 3186–88.)

individuals in achieving more effective personal, social, educational, or career development and adjustment, including the diagnosis and treatment of mental and emotional disorders.

Ohio Rev. Code § 4757.01(A). In turn, "clinical counseling principles, methods, or procedures" is defined in Ohio Rev. Code § 4757.01(B) as

> an approach to counseling that emphasizes the counselor's role in systematically assisting clients through all of the following: assessing and analyzing background and current information, diagnosing mental and emotional disorders, exploring possible solutions, and developing and providing a treatment plan for mental and emotional adjustment or development. "Clinical counseling principles, methods, or procedures" includes at least counseling, appraisal, consulting, and referral.

Despite testifying during her deposition that she is not actually engaged in counseling (Kaminsky Dep. at 797 (23)), when King questioned Kaminsky's counseling qualifications under State law,[27] Kaminsky insisted, as late as July 2017, that she is "a credentialed grief counselor by the standards of the State of Ohio[,]" although she claims that, since she is "not a Social Worker," she "does not fall under the licensure requirements[.]" (Franks Dep. at 2741 (Pl. Ex. 89).) In addition, when Kaminsky completed her regular self-assessments, beginning with her very first one in September 2005, she described herself as a "grief counselor" and her work as "grief counseling." (*See, e.g.*, Kaminsky Dep. at 930–33 (Def. Ex. D).)[28] Her job description identified her as a "Grief/Bereavement Counselor & Educator[.]" (*Id.* at 1009 (Def. Ex. O).)[29] The "major duties" of the position were quite broad and included not only training duties but also responsibility

---

[27] King acknowledged that she "raised the question" of Kaminsky's credentials with Aquilina because Kaminsky was "one of [King's] supervisees[.]" (King Adm. Dep. at 1483.)

[28] In her opposition brief, Kaminsky ineffectively attempted to disavow her use of these terms, claiming that, when performing her self-assessments, she "[had] to use the headings that are in the position description[.]" (Opp'n at 3187, n. 57.) But this assertion is belied by her insistence to Franks that she is "a credentialed grief counselor."

[29] Kaminsky argues that "[t]he term 'counseling' was used as a term that people could understand." (Opp'n at 3187, n. 57 (citing Kaminsky Dep. at 818 (109)).) But that does not help her, as it means she was, indeed, holding herself out to people as a "counselor."

for "provid[ing] . . . therapeutic and spiritual growth groups in such areas as coping with serious illness, terminal illness, chronic illness and grief counseling." (*Id*. at 1012.) In addition, Kaminsky was to "devote[] much of [her] time to spiritual care of individual patients looking to the solution of personal problems." (*Id*.) Included in the "[k]nowledge required by the position" was an ability "to perform a wide variety of interrelated or nonstandard procedural assignments and to resolve a wide range of problems." (*Id*. at 1013.) The grief/bereavement and spiritual care instruction component of the position anticipated "conducting regular group discussions which can have considerable therapeutic value." (*Id*. at 1013–14.) Kaminsky's responsibilities "require[d] full utilization of [her] special training and specialized spiritual care experience[,]" and "[p]articipat[ion] as a fully recognized member of an integrated multi-professional treatment team." (*Id*. at 1014.)

In her opposition brief, Kaminsky claims there is a material factual dispute over whether "holding a counseling license is an essential function" of her position. (Opp'n at 3186.) But the "essential *function*" would not be the holding of a license; it would be the performing of counseling, which, under Ohio law, requires a license. When Franks explained to Kaminsky why she was being transferred to a new position in HR, he stated: "the core mission of the job is the grief and bereavement counseling component; therefore, a rewritten PD [position description], absent these duties, is of little value." (Franks Dep. at 2736 (Pl. Ex. 87).)

As is apparent from Kaminsky's position description, the VA considered counseling an essential function of her job and, as a general rule, the employer's view is controlling in that regard. *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 761–62 (6th Cir. 2015). It is not necessary for the position description to state explicitly that a counseling license is required; Ohio law requires it in order to perform the essential counseling functions. While it is not entirely clear why Kaminsky's

16

lack of a license did not surface before 2016,[30] once it was revealed, the VA would not have been free to simply overlook it and/or to allow Kaminsky to continue in a counseling role without the credentials required by Ohio law.

The VA also argues that, besides failing to show she was "qualified" for the position, Kaminsky also cannot establish that her reassignment to the position in HR was an "adverse employment action"—that is, "'a materially adverse change in the terms of her employment.'" *White v. Burlington N. & Santa Fe R. Co.*, 364 F.3d 789, 797 (6th Cir. 2004) (quoting *Kocsis v. Multi–Care Mgmt., Inc.*, 97 F.3d 876, 885 (6th Cir. 1996)).

Here, the VA made every effort to redefine Kaminsky's job in the social services care line in a manner that would retain her grade and salary, without including the counseling responsibilities that required a license. When that proved impossible, the VA assigned Kaminsky to a training specialist job in another department that would utilize her skills, without requiring a license, while allowing her to retain her grade and pay.

"Work reassignments without salary . . . changes do not ordinarily constitute adverse employment decisions." *Smith v. Cty. of Hamilton*, 34 F. App'x 450, 455–56 (6th Cir. 2002) (citations omitted). But "[a] reassignment without salary or work hour changes . . . may be an adverse employment action if it constitutes a demotion evidenced by a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Kocsis*, 97 F.3d at 886 (quotation marks and citation omitted); *Spees v. James Marine, Inc.*, 617 F.3d 380, 391 (6th Cir. 2010) (noting that "[a]dverse

---

[30] In fact, during his deposition, Franks testified that, at the time the position was created, "a staffing specialist in human resources made a determination that [Kaminsky] was qualified for the job[.]" (Franks Dep. at 2670.) Kaminsky has not relied upon this in any way, perhaps recognizing that this probably erroneous determination by a staffing specialist does not change the fact that Ohio law requires a counseling license that Kaminsky never possessed.

employment actions are typically marked by a 'significant change in employment *status*,' including '. . . reassignment with significantly different responsibilities,' . . . ." (citing *White*, 364 F.3d at 798 (quoting *Burlington Indus. v. Ellerth,* 524 U.S. 742, 761, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998) (emphasis added)). In *Spees*, the court concluded that a material factual dispute existed over whether the employee's transfer to another position was an adverse employment action, where the employee "felt unchallenged by [the new] position" and testified "she found it to be 'more boring' than" her former position. *Id.* at 392.

Kaminsky asserts in her opposition brief that her reassignment "substantially reduced her job responsibilities[,]" and that "[i]n HR, her only job duties were employee education and development." (Opp'n at 3190.) While Kaminsky may have preferred or enjoyed her former position more, as pointed out in the VA's reply, her former position (without redefinition) and her new position had the same GS-12 grade, which, in the VA, is indicative of a comparable level of job responsibility. (Johnston Decl. ¶ 4 ("Positions at the VA are graded on a scale of GS-1 to GS-15. Positions at the same grade level have comparable levels of responsibility.").) In other words, there is no evidence that Kaminsky's new responsibilities, even *if* substantially *different* from her former ones (which, on summary judgment, the Court will take as true), were not "substantially *diminished*" by comparison, and did not affect Kaminsky's employment *status*. Moreover, even if, under *Spees*, Kaminsky's level of dissatisfaction with her new position were sufficient to establish an adverse employment action, Kaminsky cannot overcome the legitimate reason given by the VA for her reassignment—her admitted lack of the requisite counseling license under Ohio law—or show that it was a pretext for discrimination.

Kaminsky also asserts in a conclusory fashion that the transfer was "adverse" because it "damaged [her] professional reputation considerably[.]" (Opp'n at 3190.) "'Although purely

18

subjective injuries, such as dissatisfaction with a reassignment, public humiliation, or loss of reputation, are not adverse actions, the threshold is met when an employee experiences materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm.'" *Mazumder v. Univ. of Michigan*, 195 F. App'x 320, 327 (6th Cir. 2006) (quoting *Holcomb v. Powell*, 433 F.3d 889, 902 (D.C. Cir. 2006)) (internal quotation marks omitted). Kaminsky offers no evidentiary support for her assertion other than her own personal assumption that others thought less of her. (*See, e.g.*, Kaminsky Dep. at 827 (142) ("I was on a first name basis with all of those individuals [in the hospice community]. When that letter goes out saying we've removed DonnaMarie from that position and we've given it to someone else, what are they going to think?").)

All of the other employment actions raised by Kaminsky as proof of discrimination are among the kinds routinely rejected by courts as "adverse." For example, movement to a smaller office generally does not qualify. (*See* MSJ at 454 (collecting cases).) King's one-half-hour schedule change in Kaminsky's tour of duty, and the resulting denial of compensatory time allowances, is not an "adverse" action. *Wade v. Automation Pers. Servs., Inc.*, 612 F. App'x 291, 295–96 (6th Cir. 2015) (holding that a one-hour schedule change was a mere inconvenience, not an adverse employment action); *Smith v. Cty. of Hamilton*, 34 F. App'x at 456 (holding that loss of opportunity for compensatory time off was not an adverse employment action). The denial of Kaminsky's request in October 2016 for 69.5 hours of advanced sick leave ("ASL") at a time when she already had a negative sick leave balance of 166.5 hours, and in the face of her four-year pattern of requiring ASL without being able to repay it, was not an "adverse" action. *See Sapp v. Potter*, No. 1:07-cv-00650, 2012 WL 3890259, at *13 (E.D. Tex. July 26, 2012) (holding that

19

denial of six weeks of advanced sick leave was not an adverse employment action). In addition, the VA had a non-discriminatory policy of denying ASL for employees "who have [not] demonstrated, through their prudent use of leave, that they will be able to readily reduce the advanced sick leave balance during the tenure of their employment." (MSJ at 458 (quoting VA Handbook).) Kaminsky's complaint that her overnight parking space in Akron (for her GSA-assigned vehicle) was changed to Parma (her official duty station) amounts to a *de minimis* change in conditions and was made necessary by the need for regular Akron staff to use that parking space. The fact that she resided in Akron may have made the Akron spot convenient, but the change to a spot at her official duty station was not an "adverse" action. *See, e.g.*, *Hardin v. Wal-Mart Stores, Inc.*, 604 F. App'x 545, 547 (9th Cir. 2015) ("change in parking spaces did not materially affect the terms, conditions, or privileges of [plaintiff's] employment and therefore did not constitute an adverse employment action[]"). In addition, the counseling letter Kaminsky received after she sent an angry email about the parking space, and copied her attorney, was not, as a matter of law, an "adverse" action. *See, e.g.*, *Taylor v. Geithner*, 703 F.3d 328, 338 (6th Cir. 2013) (letter of reprimand not materially adverse action). Kaminsky's complaint that, between July and September 2017 while she was waiting to begin her new position in HR, she was assigned administrative tasks (e.g., photocopying)—which she attributes to discrimination and retaliation—simply lacks merit. The record is clear that she was offered a substantive interim project that she declined. In any event, temporary duties do not constitute an adverse employment action where, as here, Kaminsky continued to receive her same pay and benefits while performing the clerical tasks she disliked. *See, e.g.*, *Kinamore v. EPB Elec. Util.*, 92 F. App'x 197, 202–03 (6th Cir. 2004) (holding that seasonal responsibilities—"by definition a temporary job assignment"—were not an adverse action).

20

Kaminsky next argues that all of these situations, in the aggregate, can constitute an "adverse employment action" (Opp'n at 3188 (citing *Ford v. Gen. Motors Corp.*, 305 F.3d 545, 554 (6th Cir. 2002); *Simas v. First Citizens' Fed. Credit Union*, 170 F.3d 37, 50 (1st Cir. 1999)).) The cases she cites involve employment actions that are in no way comparable to those she alleges. And, importantly, Kaminsky fails to point to any evidence here of causation—that is, any evidence that these events, individually or in the aggregate, were the result of improper consideration of age and/or disability.[31]

Because Kaminsky cannot establish her *prima facie* cases and, in any event, because the VA had a legitimate non-discriminatory reason for its employment decision, the VA is entitled to summary judgment as to Count I (disability discrimination) and Count IV (age discrimination).

### C.  Failure to Accommodate (Count II)

To establish a *prima facie* case of failure to accommodate, a plaintiff must show generally the same elements as for the RA case, plus that an accommodation was needed and the defendant failed to provide it. *Gaines v. Runyon*, 107 F.3d 1171, 1175 (6th Cir. 1997). If the plaintiff succeeds, the burden shifts to the defendant to demonstrate that the employee cannot reasonably be accommodated, because the accommodation would impose an undue hardship on the operation of its programs. *Id.* at 1175–76.

---

[31] Kaminsky has also not shown she was replaced by someone outside her protected class. Although the VA argues that it eliminated her position (MSJ at 461), in fact, the Social Work Service was unable to replace Kaminsky because it lost a full-time equivalent. (Amato Decl. ¶ 3.) Arguably, should the FTE be made available at some time in the future, the position Kaminsky held might be able to be filled. Kaminsky argues, however, that another employee— Jill Dunmire-Siddiq—"took over [her] duties." (Opp'n at 3192). But, "[s]preading the former duties of a[n] . . . employee among the remaining employees does not constitute replacement." *Stearman v. Ferro Coals, Inc.*, 751 F. App'x 827, 831 (6th Cir. 2018) (quoting *Lilley v. BTM Corp.*, 958 F.2d 746, 752 (6th Cir. 1992)).

Aside from failing to show that she was qualified for her position, Kaminsky has also failed to establish that the VA did not supply the accommodations she allegedly needed. There is no dispute that, as to the two requests for accommodation that Kaminsky made—a GSA vehicle (when she had a job that required transportation) and a sit-to-stand desk—both were supplied.[32]

Kaminsky's complaints with respect to the sit-to-stand desk that the VA unduly delayed and that it failed to participate in good faith in the requisite interactive process (both of which she attributes to King's alleged animus toward her) simply have no merit.

First, "an employee cannot base a disability discrimination claim upon an employer's delay in providing a requested accommodation where the delay is due to internal processing or to events outside the employer's control." *Gerton v. Verizon S. Inc.*, 145 F. App'x 159, 168 (6th Cir. 2005) (citing *Kaltenberger v. Ohio Coll. of Podiatric Medicine*, 162 F.3d 432, 437 (6th Cir. 1998); *Selenke v. Med. Imaging of Colorado*, 248 F.3d 1249, 1262 (10th Cir. 2001)). The record is replete with testimony and evidence that Kafer and the VA's ergonomic accommodation team made numerous efforts to properly and timely install the sit-to-stand desk and that they eventually accomplished that goal, by Kaminsky's own admission. *See Gardner v. W. Ky. Univ.*, No. 1:11-cv-79-DJH-LLK, 2015 WL 5299451, at *2 (W.D. Ky. Sept. 9, 2015) ("[A]ny delay in providing the requested accommodations is irrelevant because [plaintiff] admits that she ultimately received those accommodations.").

Plaintiff's reliance on *Dayton Veterans Res. Ltd. P'Ship v. Dayton Metro. Hous. Auth.*, No. 3:16-cv-466, 2019 WL 1331311, at *22 (S.D. Ohio Mar. 25, 2019) for the proposition that an

---

[32] Kaminsky has made no effort to meet her burden of showing that she was, in fact, disabled and/or that she had need for reasonable accommodations. Notably, she spent at least 80% of her time away from her office (that she claims was too small for moving around with her cane) and from her sit-to-stand desk. That said, the VA nonetheless *did* accommodate her.

undue delay can amount to constructive denial of a requested accommodation (Opp'n at 3199) is entirely misplaced. First, that case was not applying the RA's requirement to accommodate a disabled person, but the Fair Housing Act's requirement for making "reasonable accommodations in rules, policies, practices, or services[.]" Second, the bottom line in that case was that there was a material factual dispute as to whether the defendant housing authority "arbitrarily, capriciously and discriminatorily blocked funding for, and financing of, 60 units of project-based affordable housing for homeless veterans, most of whom are disabled." *Dayton Veterans*, 2019 WL 1331311, at *1. The defendant tried to argue that its then-current administrative plan and federal housing regulations did not permit it to apply for the funding. Plaintiff countered that, if defendant had acted in a timely manner to amend its administrative plan (as plaintiff had requested), it could have applied for funding on plaintiff's behalf and the project could have moved forward. It was in that context that the district court noted that defendant's "alleged failure to take timely action to amend its Administrative Plan had the same effect as an outright denial." *Id*. at *22 (citing *Bhogaita v. Altamonte Heights Cond. Ass'n, Inc.*, 765 F.3d 1277, 1286 (11th Cir. 2014) (noting that an undue delay can amount to constructive denial of a requested accommodation)). The court then concluded that summary judgment for either party was precluded by a material factual dispute as to whether defendant was on timely notice that an accommodation (*i.e.*, an amendment to the administrative plan) had been requested by plaintiff. The case plaintiff relies upon is completely inapplicable here where, by her own admission, any delay in plaintiff's receipt of her requested accommodation was *de minimis* and did not ultimately prevent the accommodation from occurring.

Second, Kaminsky points to nothing substantial in the record to suggest bad faith and/or discriminatory or retaliatory intent on the part of the VA or, for that matter, any actual failure to participate in the requisite interactive process. "Once the employee requests an accommodation,

the employer has a duty to engage in an 'interactive process' to 'identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.'" *Melange v. City of Ctr. Line*, 482 F. App'x 81, 84–85 (6th Cir. 2012) (quoting *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 871 (6th Cir. 2007) (internal quotation marks omitted)). "To show that an employer failed to participate in the interactive process, a disabled employee must demonstrate: 1) the employer knew about the employee's disability; 2) the employee requested accommodations or assistance for his or her disability; 3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and 4) the employee could have been reasonably accommodated but for the employer's lack of good faith." *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 319–20 (3d Cir. 1999) (quoted by *Clark v. Whirlpool Corp.*, 109 F. App'x 750, 755 (6th Cir. 2004)).

In her opposition brief, Kaminsky identifies four instances of King's alleged failure to engage in the interactive process (which she attributes to the VA): (1) personally delivering moving boxes to Kaminsky's Wade Park office; (2) refusing to order a "move matrix" for Kaminsky's move from Wade Park to the EUL building; (3) failing to follow up to see if Kaminsky's adaptive equipment was properly moved, claiming it was not her responsibility to do so; and (4) removing Kaminsky's special parking privileges.[33] (Opp'n at 3199.) She claims that she "could have been reasonably accommodated but for [d]efendant's lack of good faith." (*Id.*)

---

[33] This reference to removal of her "parking privileges" relates to Kaminsky's complaint that her overnight parking space in Akron (where she resides) for her GSA-assigned vehicle was changed to Parma (her official duty station) when, due to a change in programs in Akron (with a new program moving in), the regular Akron staff would need to use Kaminsky's parking space. Kaminsky perceived this directive from King as: "Again, how can I make Ms. Kaminsky's life miserable. I'm going to make it miserable this way." (Kaminsky Dep. at 856 (258).)

The problem with this assertion is that Kaminsky *was* accommodated—she was assigned a GSA vehicle and given a sit-to-stand desk.

Finally, Kaminsky claims that the VA's denial of her request for ASL was a denial of a reasonable accommodation for her disability. She sites cases and regulations noting that both paid and unpaid leave are "potential form[s] of reasonable accommodation[.]" (Opp'n at 3198 (quoting *Hankins v. The Gap, Inc.*, 84 F.3d 797, 801 (6th Cir. 1996) and citing 29 C.F.R. § Pt. 1630.9, App.).) *Hankins*, however, did not hold that denying leave was a failure to accommodate; instead, it held that the fact that the employee had *available* leave to use when she suffered a migraine was itself a form of accommodation. Here, as in *Hankins*, Kaminsky could have used annual leave (and apparently did so) or unpaid leave when her ASL request was denied.

Kaminsky has failed to establish any failure by the VA to accommodate any disability. Therefore, the VA is entitled to summary judgment on Count II.

### D. Hostile Work Environment (Disability- and Age-Based) (Counts III and V)

To survive a motion for summary judgment on a hostile work environment claim, Kaminsky must establish that (1) she is a member of a protected class; (2) she was subjected to harassment, either through words or actions, based on her protected status; (3) the harassment had the effect of unreasonably interfering with her work performance and creating an objectively intimidating, hostile, or offensive work environment; and (4) there exists some basis for liability on the part of the VA. *Grace v. USCAR*, 521 F.3d 655, 678 (6th Cir. 2008); *Brown v. Metro. Gov't of Nashville & Davidson Cty*, 722 F. App'x 520, 525 (6th Cir. 2018). Notably, any alleged harassment must be based on the protected status, not merely the result of "personal dislike[.]" *Barnett v. Dep't of Veterans Affairs*, 153 F.3d 338, 343 (6th Cir. 1998) ("'personal conflict does not equate with discriminatory animus[]'") (quoting the district court). In addition, harassment

must meet both an objective and a subjective test—"the conduct must be so severe or pervasive as to constitute a hostile or abusive working environment both to the reasonable person and the actual victim." *Randolph v. Ohio Dep't of Youth Servs.,* 453 F.3d 724, 733 (6th Cir. 2006).

None of the instances alleged by Kaminsky rise to the level of a hostile work environment, that is, a workplace "permeated with [what a reasonable person would perceive as] discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." (Opp'n at 3195 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993) (internal quotation marks and citations omitted)) (alteration added).) She has *only* her own *subjective* beliefs that she suffered "an emotional toll" by "not being able to do direct clinical work any longer" and by "knowing that people were thinking she was placed in HR for disciplinary reasons." (*Id.*) Although the standard for determining a hostile work environment is both objective and subjective, a plaintiff must satisfy both. Kaminsky fails to meet the objective standard[34] and even her subjective belief is little more than an expression of her hurt feelings and/or dislike or disapproval of actions taken by the VA. In addition, Kaminsky is essentially arguing that the fact of her reassignment *was* itself the hostile work environment.

Notably, even if Kaminsky were able to show severe and/or pervasive harassment, she has not shown that it was *based on* any particular protected status. She points to nothing suggesting harassment based on her alleged disability (which itself is questionable enough on this record). The two arguably age-related comments that Kaminsky relies upon are simply insufficient to meet her burden. First, she claims that, in 2017, when a man announced his retirement, "King loudly

---

[34] There is no suggestion in this record that Kaminsky's performance suffered in any way as a result of her reassignment. (*See* Kaminsky Dep. at 808–10 (67–75) (discussing her work performance during all relevant times).)

responded 'well, it's a good thing some people know when to retire. Some people stay too long.'" (Opp'n at 3195.) "Kaminsky believes this comment was directed toward her." (*Id*.) The second remark relied upon was made by a third party, whom Kaminsky claims was a "close friend of King," who allegedly suggested to another social worker in the department that "it's time for you to retire and let younger social workers take over[.]" (*Id.* at 3195–96.) These isolated comments, only one of which was made by King, but was not directed toward Kaminsky, are entirely insufficient to satisfy Kaminsky's burden.

The VA is entitled to summary judgment on Counts III and V.

### E.    Reprisal/Retaliation (Counts VI and VII)

To state a claim of reprisal (or what is more commonly known as retaliation), Kaminsky must show: "(1) that [s]he engaged in protected activity; (2) that [the VA] had knowledge of [her] protected conduct; (3) that [the VA] took an adverse employment action towards [her]; and (4) that there was a causal connection between the protected activity and the adverse employment action." *Fox v. Eagle Distrib. Co.*, 510 F.3d 587, 591 (6th Cir. 2007) (citing *Weigel v. Baptist Hosp. of E. Tennessee,* 302 F.3d 367, 381 (6th Cir. 2002)). The causation element "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360, 133 S. Ct. 2517, 186 L. Ed. 2d 503 (2013).

The VA does not dispute that Kaminsky can establish elements one and two. It argues, again, that Kaminsky did not suffer an adverse employment action and that she fails to establish the requisite causal connection between her protected activity and her reassignment.

For a retaliation claim, to show an adverse employment action, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse," which is

27

defined as an action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006) (internal quotation marks and citations omitted).

Here, none of the actions taken by the VA, except Kaminsky's reassignment, constitutes an adverse employment action under this standard. And because the VA reassigned Kaminsky from her grief counseling position to HR for a legitimate, non-retaliatory reason—her lack of a requisite counseling license—Kaminsky cannot prevail on either of her claims of reprisal/retaliation.

The VA is entitled to summary judgment on Counts VI and VII.

## IV.    CONCLUSION

For the reasons set forth above, the VA's motion for summary judgment is granted and this case is closed.

**IT IS SO ORDERED**.

Dated: July 10, 2020

_____
**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**